

# In the
## Missouri Court of Appeals
### Western District

| | | |
|---|---|---|
| **SUZANNE STEINBACH,** | ) | |
| | ) | **WD85697** |
| Appellant, | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| **MAXION WHEELS, SEDALIA,** | ) | **April 18, 2023** |
| **LLC, HAYES LEMMERZ** | ) | |
| **INTERNATIONAL,** | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**Appeal from the Labor and Industrial Relations Commission**

**Before Division Two: Alok Ahuja, Presiding Judge,
Anthony Rex Gabbert, Judge and Thomas N. Chapman, Judge**

Suzanne Steinbach appeals the Labor and Industrial Relations Commission's final award denying workers' compensation benefits. The Commission found that Steinbach's work activity was not the prevailing factor in causing her injury. In her sole point on appeal, Steinbach contends that there was not sufficient competent evidence in the record to warrant the making of the award denying her benefits. The award is affirmed.

**Factual and Procedural Background**

On November 13, 2018, Steinbach filed a claim for compensation with the Division of Workers' Compensation, asserting that she suffered an accident or occupational disease in the course and scope of her employment with Maxion Wheels ("Employer") resulting in injuries to her bilateral upper extremities and that repetitive use of a grinder was the prevailing factor in causing her injuries. On September 13, 2021, a hearing was held before the administrative law judge ("ALJ"). Steinbach presented her own testimony as well as the testimony of Corey Reiley (her nephew), Theresa Patton (Employer's former human resources supervisor), and Kayla Williams (Employer's current human resources supervisor). The parties also submitted exhibits, including Steinbach's medical records and bills, reports from medical experts, invoices and a summary of scrap metal purchased by Steinbach from Employer, and receipts for the sale of scrap metal by Steinbach. The evidence showed the following.

Steinbach was 48 years old at the time of the hearing. She is a high school graduate with some college. She has a varied vocational history, working on the production line at a chicken processing plant, as a bartender and waitress, as a prison guard, as a buyer of motorcycle parts, and at a technologies company on the production floor, in inspection, and in customer service. She did not have any

problems with her hands and never sought medical treatment for them while employed in these previous positions.

Steinbach began working for Employer in October 2015 as a temporary employee through a staffing agency. She worked the day shift in the finishing department, using a five-pound, battery-operated handheld drill with a grinder pad to grind down any drips from the chemical sealant process on the wheels before they were painted.

In May 2016, Steinbach became a permanent employee and worked the midnight shift as a controller. She would inspect wheels when they came off the line and use a little, pneumatic die grinder to file off any burrs. Steinbach testified that she would work on "approximately 1,200 wheels per night."

In early 2017, Steinbach began working as a rework coordinator on the midnight shift. If a weld on a wheel was defective, she used a big Dewalt grinder with a four and a half inch grinder wheel to grind out the weld, and then she placed a new weld. The Dewalt grinder required both hands to operate, and was a more powerful tool with more vibration and torque than the other grinders she had used in her other jobs with Employer. The position was off-line (not on the production line), and Steinbach would float and do other jobs throughout her shift including "fluff and buff," which was buffing scratches or defects on the face of the wheels

3

after being painted, or inspections on the line if it was slow. In the fall of 2017, Steinbach was moved to the day shift because there was less need for reworks on the midnight shift and more need for reworks on the day shift.

Employer kept production records for work performed by the rework coordinators. Employer introduced as an exhibit a production report showing the daily rework performed by the midnight shift between October 3, 2016, and November 1, 2017. The report showed that during that time, the maximum number of wheels reworked on the shift in one day was 265 wheels, but the average number of wheels reworked in a day was 48. Additionally, rework of a wheel averaged less than 60 seconds.

On October 5, 2017, Steinbach was seen at American Family Urgent Care in Sedalia. She reported shoulder pain and finger injury. X-rays of the shoulder and hand were normal. She was diagnosed with a sprained right shoulder and sprained right wrist/hand. Two months later, on December 5, 2017, Steinbach was seen at the same clinic and reported hand pain, ankle pain, and shoulder pain. Examination revealed abnormal range of motion and swelling in both hands and in the left ankle. The doctor wrote Steinbach an excuse from work from December 4 through December 8, 2017, and returned her to work without restrictions on December 11, 2017.

4

Employer then referred Steinbach to Dr. Brian Ellefsen, an orthopedic surgeon. On December 12, 2017, Dr. Ellefsen evaluated Steinbach for complaints of right hand numbness and pain. Steinbach reported to Dr. Ellefsen that her symptoms began a year before and had progressively worsened in the last six months with swelling, numbness, and burning in her hands bilaterally, right more than left. She also reported that approximately eight months before, she lost the motion of her right thumb. She believed that her symptoms were the result of using the large Dewalt grinder at work, and explained that she was exposed to vibratory tools and torqueing eight hours a day, five to seven days a week. She also reported that she did some welding at home, admitting to having built a table and shelving for her own use and making small gifts such as boxes using a small Mig welder and a small die grinder. She stated that she had the home welding system for about six or seven months and got her metal from Employer. Dr. Ellefsen diagnosed Steinbach with bilateral paresthesia of the hands with median nerve distribution most likely secondary to median nerve root entrapment at the wrists and right trigger thumb.

On December 19, 2017, Dr. Ellefsen sent a letter to Employer opining that Steinbach's condition could not be attributed to her work for Employer. He reviewed information provided by Employer including Employer's production

records for rework coordinators from October 2016 through November 2017, the type of welding Steinbach did at home, and the volume of scrap metal that she bought from Employer. He noted that he saw evidence of tendonitis in her hands but was unable to attribute it to her work activities at Employer over the last 18 months of her employment given the significant amount of welding she did at home.

On December 27, 2017, Dr. Ellefsen saw Steinbach again for a recheck of her right hand. Steinbach showed the doctor pictures of swelling in her hands taken in January 2016 and July 2016. Dr. Ellefsen told Steinbach about the information he received from Employer regarding her work activities and non-work activities and his concern about the welding she was doing at home. He did not change his diagnosis and reiterated his opinion that her symptoms were not related to her employment with Employer.

During this same period, Dr. Ellefsen also treated Steinbach for problems with her left foot. On January 10, 2018, Dr. Ellefsen saw Steinbach for a recheck of her left foot and for numbness and swelling in her hands. Dr. Ellefsen diagnosed her with bilateral carpal tunnel syndrome and right trigger thumb. Steinbach told the doctor that she wanted to have both carpal tunnel releases and right trigger thumb procedures performed at the same time.

6

On January 31, 2018, Dr. Ellefsen saw Steinbach for a recheck of left foot and hands. He diagnosed her with bilateral carpal tunnel syndrome and bilateral stenosing tenosynovitis of the trigger thumbs. He took her off work for two weeks and recommended that she have bilateral carpal tunnel releases and bilateral trigger thumb procedures at the same time to minimize time off of work.

On March 1, 2018, Dr. Ellefsen performed bilateral open carpal tunnel releases and bilateral trigger thumb releases. Steinbach returned to work in June 2018 with no restrictions. However, during her first week back, she experienced pain and swelling of her hands and thumbs and bruising of her palms and wrists. Dr. Ellefsen again took her off work. Steinbach was unable to return to work, and Employer ultimately terminated her employment effective August 30, 2018. She has not worked since leaving Employer and has applied for Social Security disability benefits.

In addition to the evidence regarding Steinbach's work activities and medical treatment, evidence of Steinbach's non-work related welding activities was also presented. Steinbach testified that her father, who was a professional welder and had his own business, taught her how to weld when she was thirteen years old and that she welded with her father until she was seventeen. She said that she began welding again in her basement in 2017. From January 29, 2017,

through January 22, 2018, Steinbach purchased 4,154 pounds of scrap steel from Employer. The parties agreed that the steel was properly purchased from Employer. Steinbach would walk through the facility and identify any unused steel that she wanted to purchase. She would cut the scrap steel at work on a brake press and load it into the trunk of her car. She testified that she intended to start her own business, but that her plan did not work out.

Steinbach built a work table, a shelf, and a small chair and a wagon for her granddaughter with the scrap metal. She also made medieval-style weapons like machetes and maces and shields. She described her home welding activity as "a hobby thing that I would do on occasion." She told Heidi Dixon, who worked in the HR department, about her welding, saying that she made a work table, a kid-sized table and chair for her granddaughter, and keepsake boxes and other small items. She also told Theresa Patton, the HR supervisor, about the welding she did at home and showed her some pictures of items she had made. Steinbach told her that she had made a large work table for her basement, toys, and furniture. Patton testified that Steinbach was very proud of her welding abilities.

Cory Reiley, Steinbach's nephew, testified that he lived with Steinbach and her husband (who was deceased at the time of the hearing) from the beginning of

2018 until November 2, 2018.[1]  He was aware that Steinbach purchased scrap metal from Employer and testified that it was stored in the basement of the house. He believed Steinbach made 15 to 20 small trinkets, like jewelry boxes, with the scrap metal in the almost one year that he lived in the house.  Reiley and Steinbach's husband, and sometimes some neighbors, worked in the basement of the Steinbachs' house almost every night making items with the scrap metal while Reiley lived there.  They made racks to store the metal on, tables, shelves, boxes, machetes, and wall decorations.  Reiley testified that Steinbach would hang out with them in the basement when she got home from work but that she would not work with them.  He said that sometimes she would ice her hands when she was downstairs with them and that sometimes she would come home from work crying because of the pain.

Around November 2018, Steinbach moved out of her house, and she needed to dispose of the scrap metal in the basement.  Receipts showed that Reiley sold 260 pounds of scrap metal to a recycling company in May 2018 and that Steinbach sold 2,120 pounds of scrap metal in November 2018.  Steinbach and Reiley both testified that Steinbach left about 50% of the scrap metal that she had purchased from Employer in her basement when she moved out.

---

[1] Reiley also testified that he would go over to the Steinbachs' house almost every day in 2017 before he moved in with them.

On May 11, 2020, Dr. James Stuckmeyer performed a medical examination of Steinbach at the request of her attorney. He reviewed medical records (including Dr. Ellefsen's records and opinion letter), conducted a physical examination, and interviewed Steinbach. Dr. Stuckmeyer's opinions were contained in his May 13, 2020 report.

In his report, Dr. Stuckmeyer noted that Steinbach told him that "she would continuously grind wheels, up to 1,000 wheels per night." She stated that as a result of the intense, repetitive nature of her work duties, primarily using a grinder to grind wheels, she began to develop symptoms of pain in the right and left hand with symptoms of numbness and tingling bilaterally, decreased grip strength, as well as triggering phenomenon in both of her thumbs. Dr. Stuckmeyer also noted that Steinbach had told Dr. Ellefsen she used a large Dewalt grinder at work and was exposed to vibratory and torqueing tools eight hours a day, five to seven days a week. Steinbach also told Dr. Stuckmeyer that she did "some welding at home but on a very occasional basis," describing it as "craft welding," and admitted to building a table and shelving for her own use.

Dr. Stuckmeyer opined that although Steinbach "did do outside welding at home," the intense repetitive nature of the occupational duties, specifically grinding wheels while employed by Employer, was the "direct, proximate, and

prevailing factor" in causing her symptoms of bilateral carpal tunnel releases, bilateral trigger thumb phenomenon, and new development of trigger fourth digit. He emphasized the "intensity" of the grinding activities, "grinding up to 1,000 wheels per night, 5 to 7 days a week." Dr. Stuckmeyer assessed a 25% permanent partial disability to the right wrist and 25% permanent partial disability to the left wrist, and recommended work restrictions of no repetitive gripping with either hand and no exposure to vibratory or torque tools.

Following the hearing, the ALJ issued a decision denying compensation, finding that Steinbach's work activity was not the prevailing factor and not sufficiently repetitive to cause her injury to her bilateral hands and wrists. It found that Steinbach's testimony about her work activity and her welding activity at home was not credible, that Dr. Stuckmeyer's opinion was not credible because Steinbach provided an inaccurate work history, and that Dr. Ellefsen's opinions were more credible because they were based on a more accurate description of Steinbach's work activities.

Steinbach filed an application for review with the Commission. In a 2-1 vote, the Commission issued its final award denying compensation, affirming the ALJ's decision, and incorporating it in the final award. The dissenting commissioner found that Dr. Ellefsen's opinion was not credible because it relied

on inaccurate information from Employer regarding the amount of scrap metal Steinbach used in her after-work activities. This appeal by Steinbach followed.

## Standard of Review

Under article V, section 18 of the Missouri Constitution, an appellate court reviews the Commission's decision to determine if it is "supported by competent and substantial evidence upon the whole record." *Cosby v. Treasurer of State*, 579 S.W.3d 202, 205 (Mo. banc 2019). Additionally, section 287.495.1[2] provides, in pertinent part:

> Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

*See also Cosby,* 579 S.W.3d at 206.

---

[2] All statutory references are to RSMo 2016 unless otherwise indicated.

The appellate court examines the record as a whole to determine if the award is supported by sufficient competent and substantial evidence, or whether the award is contrary to the overwhelming weight of the evidence. *Mirfasihi v. Honeywell Fed. Mfg. & Tech., LLC*, 620 S.W.3d 658, 666 (Mo. App. W.D. 2021). The award is reviewed objectively and not in the light most favorable to the award. *Id.* The appellate court reviews issues of law, including the Commission's interpretation and application of the law, *de novo*. *Id.* It defers, however, to the Commission's findings as to weight and credibility of testimony and are bound by its factual determinations. *Id.* "The Commission, as the finder of fact, is free to believe or disbelieve any evidence." *Id.* (internal quotes and citation omitted). To the extent that the Commission affirmed and adopted the findings and conclusions of the ALJ, the appellate court reviews the ALJ's findings and conclusions for error. *Hayes v. Ginger C, LLC*, 582 S.W.3d 140, 146 (Mo. App. W.D. 2019).

**Analysis**

In her sole point on appeal, Steinbach contends that the Commission erred in sustaining the ALJ's final award denying compensation benefits. She argues that there was not sufficient competent evidence in the record to warrant the making of the award under section 287.495.1(4).

Challenges to an award under subsection (4) must follow three analytical steps: (1) set out all record evidence favorable to the award, (2) set out all unfavorable evidence, subject to the Commission's explicit or implicit credibility determinations, and (3) show in the record how the unfavorable evidence so overwhelms the favorable evidence and its reasonable inference that the award is, in context, not supported by competent and substantial evidence. *Comparato v. Lyn Flex W.*, 611 S.W.3d 913, 920 (Mo. App. E.D. 2020).

The provisions of the Missouri Workers' Compensation Law are to be construed strictly, and the evidence is to be weighed impartially without giving any party the benefit of the doubt. *Annayeva v. SAB of TSD of City of St. Louis*, 597 S.W.3d 196, 198-99 (Mo. banc 2020); § 287.800. An employer shall be liable to furnish compensation "for personal injury or death of the employee by accident or occupational disease arising out of and in the course of the employee's employment." § 287.120.1. An "occupational disease" is defined as "an identifiable disease arising with or without human fault out of and in the course of the employment." §287.067.1. "Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease[.]" *Id.* "An injury due to repetitive motion is recognized as an occupational disease[.]" §

14

287.067.3. "An occupational disease due to repetitive motion is compensable only if the occupational exposure was the prevailing factor in causing both the resulting medical condition and disability." *Id.* The "prevailing factor" is defined as "the primary factor, in relation to any other factor, causing both the resulting medical condition and disability." *Id.* "The determination of whether an accident is the 'prevailing factor' causing an employee's condition is inherently a factual one." *Mirfasihi*, 620 S.W.3d at 667 (internal quotes and citation omitted).

A workers' compensation claimant bears the burden of proof to show an injury is compensable. *Comparato*, 611 S.W.3d at 920. The burden of proof consists of two parts—the burden of production and the burden of persuasion. *Id.* "The burden of production is a party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder." *Id.* The burden of persuasion is the party's duty to convince the finder of fact to view the facts in a way that favors the party. *Id.* at 920-21.

"[T]o support a finding of occupational disease, an employee must provide substantial and competent evidence that [she has] contracted an occupationally induced disease rather than an ordinary disease of life." *Mirfasihi*, 620 S.W.3d at 667 (internal quotes and citation omitted). *See also Comparato*, 611 S.W.3d at 921. To show a recognizable link between an occupational disease and the job, the

15

claimant must produce evidence of a causal connection between the conditions of employment and the occupational disease. *Id*. "This evidence must be medical evidence and must establish a probability that working conditions caused the disease, although they need not be the sole cause." *Mirfasihi*, 620 S.W.3d at 667 (internal quotes and citation omitted). *See also Comparato*, 611 S.W.3d at 921.

Steinbach contends that there was not sufficient and competent evidence in the record to warrant the making of the Commission's award denying compensation, specifically with regard to Steinbach's non-work welding activity versus her work activity. She asserts that the Commission erred in believing Dr. Ellefsen's opinion that Steinbach did a significant amount of welding work at home because the doctor relied on incorrect and incomplete information furnished by Employer. In particular, she argues that while Employer and Dr. Ellefsen knew that she had purchased a large amount of scrap metal from Employer, neither knew that she and her nephew had later sold about half of the scrap metal she purchased from Employer or that Steinbach's husband and nephew had made items from the metal almost every night, leaving Dr. Ellefsen with the impression that Steinbach used all of the metal purchased from Employer for her own welding activities.

"The weight afforded a medical expert's opinion is exclusively within the discretion of the Commission." *Mirfasihi*, 620 S.W.3d at 666 (internal quotes and citation omitted). *See also Comparato*, 611 S.W.3d at 921 ("Acceptance or rejection of medical evidence is for the Commission to determine." (internal quotes and citation omitted)). "Furthermore, where the right to compensation depends on which of two medical theories should be accepted, the issue is peculiarly for the Commission's determination." *Mirfasihi*, 620 S.W.3d at 666 (internal quotes and citations omitted). "The Commission is free to believe whatever expert it chooses as long as that expert's opinion is based on substantial and competent evidence." *Comparato*, 611 S.W.3d at 921 (internal quotes, citations, and emphasis omitted). The appellate court will uphold the Commission's decision to accept one of two conflicting medical opinions if such a finding is supported by competent and substantial evidence. *Mirfasihi*, 620 S.W.3d at 666; *Comparato*, 611 S.W.3d at 921. It will not overturn the Commission's determination regarding conflicting medical opinion unless it is against the overwhelming weight of the evidence. *Mirfasihi*, 620 S.W.3d at 666.

Steinbach is correct that Dr. Ellefsen's opinion was based, in part, on the report from Employer that it had sold Steinbach scrap metal to be used in her home welding activities. She is also correct that Dr. Ellefsen's opinion did not mention

17

evidence that Steinbach and her nephew sold about half of the scrap metal she purchased from Employer (shown by receipts and their testimony) or that Steinbach's husband and nephew made items from the metal almost every night (as testified to by Steinbach and her nephew). The Commission, however, found that the party's evidence regarding the amount of welding Steinbach did at home was inconclusive, stating, "I suspect that [Steinbach] underplays her welding [at home] while the employer likely over estimates her home activity." Moreover, the Commission seemingly acknowledged that Dr. Ellefsen's opinion may not have accounted for the fact that not all of the scrap metal sold to Steinbach was used by her, but it determined that Dr. Ellefsen's opinion was more credible than Dr. Stuckmeyer's regarding Steinbach's *work activities*. It found, "Even if Dr. Ellefsen over estimated the extent of [Steinbach's] welding activity outside of the work place, he had a much clearer and more accurate information about [Steinbach's] use of her hands in the work place."

As noted, Steinbach had the burden to show her injury was compensable by showing, with medical evidence, a causal connection between the conditions of employment and the occupational disease. *Mirfasihi*, 620 S.W.3d at 667; *Comparato*, 611 S.W.3d at 921. While Steinbach met her burden of production by introducing Dr. Stuckmeyer's report, she failed to meet the burden of persuasion.

18

The Commission rejected Dr. Stuckmeyer's opinion that the repetitive nature of Steinbach's occupational duties, specifically grinding wheels while employed by Employer, was the direct, proximate, and prevailing factor in causing her hand injuries. The record contained sufficient competent evidence to support the Commission's conclusion.

Dr. Stuckmeyer's opinion was based on Steinbach's verbal description of her job duties and her medical records. Steinbach told Dr. Stuckmeyer that the symptoms in her hands and thumbs developed as a result of the intense, repetitive nature of her work duties, primarily using a grinder to grind wheels. She said that she would continuously grind up to 1,000 wheels a night. Dr. Stuckmeyer's opinion emphasized the "intensity" of Steinbach's work, stating that "she was performing the grinding activities at [Employer], grinding up to 1,000 wheels per night, 5 to 7 days a week." However, according to Dr. Ellefsen's treatment records for Steinbach, which Dr. Stuckmeyer reviewed and cited in his report, Steinbach reported to Dr. Ellefsen at her first appointment on December 12, 2017, that her symptoms began a year before and had progressively worsened to swelling, numbness, and pain in hands and loss of motion in her thumb in the last six months and that she believed that her symptoms were the result of using the large Dewalt grinder at work. Steinbach's report to Dr. Ellefsen of the development and

worsening of her symptoms and of her belief of the cause coincided with her work activities as a rework coordinator in 2017. Employer's production records showed that an average of 48 wheels were reworked in a day on the midnight shift during the relevant time, with the rework of a wheel averaging less than 60 seconds and with the maximum number of wheels reworked in a day of 265. Patton, the HR supervisor, testified that Steinbach was not the only employee doing reworks during the time period covered by the records. The records were also consistent with Patton's and Steinbach's undisputed testimony that Steinbach's rework coordinator position was an off-line position and that she did not use the Dewalt grinder for the whole shift but did other jobs as needed. While Dr. Stuckmeyer had Dr. Ellefsen's opinion letter, which mentioned Employer's production records, nothing in Dr. Stuckmeyer's report indicated that he had the production records or was aware of what they reported or that he knew of the off-line nature of Steinbach's position. The Commission found Dr. Stuckmeyer's opinion was not credible because it was "based on a greatly exaggerated description of [Steinbach's] work activity." The Commission was free to reject Dr. Stuckmeyer's opinion. *Mirfasihi*, 620 S.W.3d at 666; *Comparato*, 611 S.W.3d at 921.

Likewise, the Commission was free to find Dr. Ellefsen's opinion that Steinbach's work did not cause her problems with her hands more credible "based

on a more accurate description of [Steinbach's] work activities." *Id.* Dr. Ellefsen reviewed Employer's production records for reworks on the midnight shift. As discussed, those records showed that rework coordinators did not rework and grind the large volume of wheels that Steinbach claimed but instead averaged 48 wheels a shift, in an average of less than 60 seconds a wheel. Unlike Dr. Stuckmeyer's opinion regarding Steinbach's work activities, Dr. Ellefsen's opinion was based on substantial and competent evidence.

As to whether Steinbach's work activity was the prevailing factor in causing the condition with her hands, the Commission was within its discretion in finding Dr. Ellefsen's opinion more persuasive than Dr. Stuckmeyer's. *Id.* The court cannot reweigh the Commission's credibility determinations or the weight given to conflicting evidence regarding Steinbach's work activity. *Comparato*, 611 S.W.3d at 923. The Commission was presented with two experts with conflicting opinions, and it was the Commission's prerogative to find Dr. Ellefsen's opinion more credible. *Id.* The Commission noted that its consideration of the case was made more difficult by the parties' failure to take the depositions of the doctors. Because the doctors' opinions were submitted in reports,[3] the doctors were never

---

[3] Section 287.210.7 provides, "The testimony of a treating or examining physician may be submitted in evidence on the issues in controversy by a complete medical report and shall be admissible without other foundational evidence[.]"

questioned or allowed to more fully explain and support their positions. Ultimately, Steinbach had the burden of proof, and the Commission found that she failed to meet it.

The award denying compensation was supported by sufficient competent and substantial evidence and was not contrary to the overwhelming weight of the evidence. The point is denied.

## Conclusion

The Commission's final award is affirmed.

THOMAS N. CHAPMAN, JUDGE

All concur.

22